TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00755-CV




 


Renee Sheree (Hopper) O'Carolan, Appellant



v.



Gary D. Hopper, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT


NO. 98-10618, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING







 Appellant Renee O'Carolan ("O'Carolan") seeks to reverse the trial court's property
division as rendered in the final divorce decree. In two points of error, she contends the trial court
abused its discretion in its disproportionate award of the community property to appellee Gary 
Hopper ("Hopper") and in awarding spousal maintenance as a substitute for a just and fair division
of the community property. We will reverse the trial court's property division and remand for a new
property division.


Factual and Procedural Background



 The parties were married for twenty-six years before the date of the divorce. There
were two children of the marriage; only one was under age eighteen at the time of the decree.

 Hopper earned at least $130,000 in 1999 and was earning between $8,000 and $9,000
a month at the time of the divorce. (1) O'Carolan had been unemployed for five months before the
hearing on the divorce. During the previous two years, she worked only part-time for a
concessionaire. Her highest earnings, $10.00 per hour, occurred in 1997 and 1998. O'Carolan had 
an associate (two-year) degree in fashion merchandising.

 O'Carolan testified that she had neurosurgery in February 2000 related to Chiari Type
I malformation. (2) O'Carolan testified that she experienced short-term memory loss, difficulty
concentrating, and muscle weakness. (3) Hopper acknowledged that O'Carolan had had problems in
the past requiring kidney surgery, bladder surgery, a hysterectomy, and disc surgery.

 The community property consisted of: a house on two acres of land in Dripping
Springs, valued at $130,000-150,000, carrying a debt of $86,000- 87,000; an annuity life insurance
policy with cash value of $10,000-11,000; a 1985 Honda motorcycle valued at $500; a 1995
Chevrolet Camaro, with a net value of $1500; a 1998 Chevrolet pickup with a net value of $1000;
and various items of personal property either with a minimal value or not valued.

 While married, the parties had filed for bankruptcy, discharging their pre-separation
debts. O'Carolan owed approximately $60,000 for medical expenses incurred after she and Hopper
separated. She does not have a vehicle or telephone and receives assistance in the form of food
stamps.

 The divorce was awarded on no-fault grounds. The decree awarded the house, all
three vehicles, the life insurance policy and numerous items of personal property to Hopper. The
decree also awarded all retirement funds, IRAs and pensions from Hopper's employment to him,
although he had testified that they had no remaining value. O'Carolan was awarded various items
of personal property. Hopper was ordered to pay the debt against the house and vehicles as well as
any debt he incurred after the parties' separation. Any debt O'Carolan incurred after separation was
assigned to her, including the $60,000 in medical expenses.

 The parties were appointed joint managing conservators of their seventeen-year-old
son and Hopper was awarded the right to determine the principal residence of the child. No child
support was ordered. The trial court ordered Hopper to pay O'Carolan spousal support for two years
according to the following schedule: $1,000 per month for three months; $1,500 per month for the
next eighteen months; and $2,000 per month for the last three months.


Discussion



 In a divorce decree, the trial court shall order a division of the parties' estate in a
manner that the court "deems just and right." Tex. Fam. Code Ann. § 7.001 (West 1998). Although
the trial court does not have to divide the community property equally, its division must be equitable. 
Zieba v. Martin, 928 S.W.2d 782, 790 (Tex. App.--Houston [14th Dist.] 1996, no writ); Schuster
v. Schuster, 690 S.W.2d 644, 645 (Tex. App.--Austin 1985, no writ). The trial court's discretion
is not unlimited, and there must be some reasonable basis for an unequal division of the property. 
Zieba, 928 S.W.2d at 790. The trial court, in exercising its discretion, may consider many factors,
including the parties' earning capacities, education, business opportunities, physical condition,
financial condition, age, size of separate estates, nature of the property, and the benefits that the
spouse who did not cause the breakup of the marriage would have enjoyed had the marriage
continued. Murff v. Murff, 615 S.W.2d 696, 699 (Tex. 1981); Walston v. Walston, 971 S.W.2d 687,
691 (Tex. App.--Waco 1998, pet. denied).

 We review the trial court's division of property using an abuse of discretion standard. 
Murff, 615 S.W.2d at 700; Walston, 971 S.W.2d at 691. Legal and factual sufficiency are not
independent grounds of error but relevant factors in assessing whether the trial court abused its
discretion. Doyle v. Doyle, 955 S.W.2d 478, 479 (Tex. App.--Austin 1997, no pet.). To constitute
an abuse of discretion, the property division must be manifestly unfair. See Mann v. Mann, 607
S.W.2d 243, 245 (Tex. 1980).

 Not only does a review of the record show a total absence of evidence to support an
unequal division of property in Hopper's favor, the majority of factors would support a
disproportionate division in O'Carolan's favor. Hopper did not allege any fault on O'Carolan's
part. (4) The parties' ages were roughly the same. There is no evidence that O'Carolan had any
separate estate. The record shows that Hopper had a significantly greater income, earning capacity,
and business opportunities, important factors for consideration in the division of community
property. See Finch v. Finch, 825 S.W.2d 218, 222 (Tex. App.--Houston [1st Dist.] 1992, no writ). 
Disparity in earning capacity is generally a factor weighing in favor of awarding a disproportionate
share of the community to the lower income earner, here O'Carolan. See, e.g., Thomas v. Thomas,
525 S.W.2d 200, 202 (Tex. Civ. App.--Houston [1st Dist.] 1975, no writ); Zieba, 928 S.W.2d at
790-91; Schuster, 690 S.W.2d at 645. There was no evidence of health problems on Hopper's part. 
The evidence showed that O'Carolan suffered from a severe brain malformation. The problems
caused by this brain malformation and its attendant surgery would impair O'Carolan's future earning
ability.

 The parties have one minor child who was to live with Hopper, however, there was
no evidence that the needs of the minor child provided a basis for the disproportionate award of the
community estate. The minor child turned eighteen within ten weeks of the entry of the decree. 
Although the child was expected to attend one more year of high school, there was no evidence that
divesting O'Carolan of her share of the community property was necessary to provide for the support
of the child in view of Hopper's earning ability. O'Carolan's demonstrated inability to earn a
sufficient living wage could support the trial court's failure to award child support to Hopper. (5)

 There is no evidence that the nature of the property compelled an unequal distribution
in Hopper's favor. O'Carolan occupied the house, the principal asset, at the time of trial. The
testimony concerning the value and marketability of the house is rather confusing. Apparently, the
house needed repairs, some of them storm-related and covered by insurance proceeds. However,
Hopper had refused to authorize the expenditure of that money. He said he had been unable to
inspect the house closely enough to satisfy himself that the repairs were necessary, yet he also
testified about the details of the necessary repairs, suggesting familiarity with the property. Although
the trial court seemed to think that Hopper was better able to deal with supervising the repairs, and
perhaps should occupy the house until his son finished high school, this could be accomplished in
various ways, such as awarding occupancy to Hopper for a period of time during which he could
supervise the repairs, and then ordering the property sold with the proceeds to be divided between
the parties. We note that Hopper had requested that the property be sold and the proceeds divided.

 It appears that the trial court treated spousal maintenance as if it were property and
attempted to use that maintenance in lieu of awarding any property to O'Carolan. (6) Spousal
maintenance, however, is not property. The legislative purpose in enacting provisions for spousal
maintenance was to provide temporary and rehabilitative support for a spouse whose ability for self-support is lacking or has deteriorated over time while engaged in homemaking activities and whose
capital assets are insufficient to provide support. See Act of May 26, 1995, 74th Leg., R.S., ch. 655,
§ 10.01(a), 1995 Tex. Gen. Laws 3543, 3577; see also Barbara Ann Kazen, Division of Property at
the Time of Divorce, 49 Baylor L. Rev. 417, 438 (1997). It is an award from future income of a
spouse, subject to strict restrictions, which terminates on the death of either party. Tex. Fam. Code
Ann. §§ 8.001-.305 (West Supp. 2002). (7) Maintenance is limited to not more than three years, unless
the spouse receiving maintenance suffers from an incapacitating physical or mental disability such
that that spouse cannot support himself or herself through appropriate employment. Id. § 8.054. The
amount of maintenance is limited to the lesser of $2500 per month or twenty percent of the payor's
average monthly gross income. Id. § 8.055(a). A maintenance order is subject to modification on
a "proper showing of a material and substantial change in circumstances of either party." Id.
§ 8.057(c).

 The trial court awarded spousal maintenance for twenty-four months. Given
O'Carolan's health problems and lack of earning capacity, she may have been a proper candidate for
spousal maintenance, but such an award should not be made in lieu of any interest in the available
community property. (8) Under the trial court's payment schedule, the $2000 per month payment for
the final three months exceeds twenty percent of Hopper's income of $9,000 per month and would
be subject to modification, potentially reducing the amount of support O'Carolan receives. Id.
§§ 8.055(a)(2), 8.057. Similarly, if Hopper were to suffer a substantial reduction in income, he could
move to reduce support on that basis. Id. § 8.057(c). Finally, under the trial court's property
division, if Hopper died during the payment schedule, O'Carolan would have no property of her
own, no proceeds from the sale of community property, no income stream from Hopper, yet still be
left with a significantly impaired earning capacity. In these circumstances, an award of spousal
maintenance leaves O'Carolan vulnerable to a reduction in the total amount of money received in
a way that a fixed division of the community property would not.

 The court seemed to consider only a rough dollar equivalence between the equity in
the house and the amount of spousal support, without considering their fundamentally different
natures and purposes. (9) Spousal support is includable as taxable income to the recipient and
deductible from the payor's income, making it even more evident that the total sum of spousal
support received by O'Carolan should not be balanced against the value of community property
awarded to Hopper. Furthermore, the time value of money lessens the worth of support payable over
twenty-four months as compared to a lump sum realized from a sale of the property. A review of
the record persuades us that awarding all of the community property to Hopper and only spousal
support to O'Carolan is manifestly unfair. See Mann, 607 S.W.2d at 245.


Conclusion



 We hold that the trial court abused its discretion in awarding only spousal support in
lieu of any community property to O'Carolan. Insufficient evidence supports an unequal property
division in Hopper's favor, persuading us that the trial court's division of community property is
manifestly unfair. Accordingly, we reverse that part of the trial court's judgment and remand for a
new property division. This judgment does not affect the dissolution of the marriage or any issue
not addressed in this opinion.



 

 Bea Ann Smith, Justice

Before Chief Justice Aboussie, Justices B. A. Smith and Puryear

Reversed and Remanded

Filed: March 14, 2002

Publish

1. All estimates of earnings and values for property are drawn from the parties' testimony at
trial.  There is no inventory in the record. At the hearing on motion for new trial, counsel for
appellant claimed that a subpoena had been issued for the production of financial records at trial but
those records were not produced. Counsel for appellee responded that he had just discovered the
subpoena in the file. It appears that these records have never been produced.
2. This condition is also known as Arnold-Chiari malformation and involves a herniation of the
cerebellum into the spinal canal, causing a displacement of the brain stem. Dorland, American
Illustrated Medical Dictionary 399 (22d ed. 1951).
3. Dr. Wanda Leppard testified at the motion for new trial. According to the record from the
motion for new trial, she had testified in chambers at the divorce hearing, but that testimony was not
recorded. She had been counseling O'Carolan in connection with domestic abuse. They had
discussed the Chiari diagnosis and its impact on O'Carolan.
4. O'Carolan alleged and testified concerning Hopper's abuse and adultery. Hopper denied
those allegations. The fact-finder is the sole judge of the weight and credibility of the evidence. 
Simons v. City of Austin, 921 S.W.2d 524, 531 (Tex. App.--Austin 1996, writ denied). Because the
divorce was granted on no-fault grounds, we conclude fault was not considered in the property
division.
5. Hopper testified that his and O'Carolan's adult daughter lives with him and he is paying for
college. There was no evidence concerning the college attended and its cost, however.
6. The total amount scheduled to be paid over the two years, $36,000, appears to be an attempt
at awarding O'Carolan more than one-half the equity in the house.
7. Spousal maintenance is taxable to the payee spouse and deductible to the payor spouse. 26
U.S.C.A. §§ 71(a), 215(a) (West 1988).
8. We note that Hopper asserts in his brief that O'Carolan concedes in her brief that she does
not qualify for spousal maintenance. We find no such concession. Hopper apparently misread a
statement containing a double negative; contrary to Hopper's assertion, O'Carolan contends that she
qualifies for spousal maintenance and asserts that the trial court would have been within its
discretion to award her both a share of the community property and spousal maintenance.
9. Based on the record from the hearing on the motion for new trial, the court had expressed
concern to Dr. Leppard in chambers that O'Carolan's medical condition could cause her some
problems in managing a lump sum of money from the sale proceeds from the house. However, that
concern does not lead to the conclusion that divesting O'Carolan of her community property is the
solution to that potential problem.